UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

LANCE M.,[1]

       Plaintiff,

v.                              Civil Action No. 2:21-cv-628

KILOLO KIJAKAZI,
*Commissioner of*
*Social Security,*

       Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Lance M. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") under the Social Security Act. Specifically, Plaintiff cites three errors. He first alleges that the ALJ mistakenly analyzed the severity of his physical impairments. Plaintiff also alleges that the ALJ heard his claim in violation of the Appointments Clause of the United States Constitution, and that the Social Security Administration ("SSA") operates in violation of constitutional separation-of-powers principles. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence or the ALJ's constitutional ability to decide the case, and therefore recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

## I.    PROCEDURAL BACKGROUND

On November 22, 2019, Plaintiff initially filed for DIB. (R. 11). Plaintiff alleged disability beginning May 1, 2017, based on post-traumatic stress disorder ("PTSD"), bipolar disorder, and unspecified depression disorder. (R. 11, 281). The state agency denied his application initially and on reconsideration. (R. 11). Plaintiff then requested an administrative hearing. Id. The hearing was held on May 10, 2021, before ALJ Monica L. Flynn. Id. Counsel and a non-attorney representative represented Plaintiff at the hearing, and a vocational expert ("VE") testified. Id. At the hearing, Plaintiff amended his alleged onset date to August 1, 2019. Id.

On July 8, 2021, the ALJ denied Plaintiff's claims for DIB, finding he was not disabled during the period alleged. (R. 27). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16). She also found that Plaintiff could perform past relevant work as a filter changer. (R. 25). On September 29, 2021, the Appeals Council denied Plaintiff's request for review. (R. 1).

On November 22, 2021, Plaintiff filed his complaint in this court. Compl. (ECF No. 1). He seeks judicial review of the Commissioner's final decision that he was not entitled to an award of DIB, claiming that "the denial of his disability claim is not supported by substantial evidence . . . and therefore the denial of his claim should be reversed or remanded for further administrative proceedings." Id. ¶ 6 (ECF No. 1, at 2). On March 2, 2022, Plaintiff moved for summary judgment. (ECF No. 11). He argues that the case should be reversed or remanded because the ALJ allegedly misapplied the step-two severity standard; because Nancy Berryhill's service as Acting Commissioner of the SSA when she ratified the ALJs' and Appeals Council judges' appointments allegedly violated the Appointments Clause; and because the removal clause for the

SSA Commissioner allegedly violates constitutional separation-of-powers principles. Pl.'s Br. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 12, at 3). On March 29, 2022, the Commissioner opposed Plaintiff's motion and moved for summary judgment. (ECF No. 13). The Commissioner argues that the ALJ's evaluation of Plaintiff's impairments is supported by substantial evidence and that Plaintiff's constitutional challenges lack merit. Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 14, at 9, 19, 24). Plaintiff replied. ("Pl.'s Reply") (ECF No. 18). After a review of the record, this Report considers each of these arguments.

## II.    FACTUAL BACKGROUND

Plaintiff was born on August 15, 1970, and at the time of the ALJ's decision, he was 50 years old. (R. 255). He met the insured status requirements under the Social Security Act until December 31, 2021. (R. 14). Plaintiff has not engaged in substantial gainful activity since August 1, 2019, the amended alleged onset date. Id. He has at least a high school education, twenty years of military service, and has reported past civilian work as a filter installer and Uber driver. (R. 25, 63–65, 282).

### A.    Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete medical review as he disputes only the ALJ's assessment of the medical history concerning his knee impairments. This Report sets out the medical history relevant to that analysis.

#### 1.    Before the Relevant Period

Plaintiff complained of knee pain on several occasions between 2014 and 2016. See, e.g., (R. 389, 436, 461, 488). In 2014, Plaintiff could "amb[ulate] on [his] knee with no difficulty." (R. 488). An April 2016 x-ray showed that his knee osteoarthritis had "slightly worsened from [a] previous exam." (R. 394). However, his "[m]obility was not limited." (R. 391); see also (R. 437)

3

(finding tenderness on ambulation but normal motion).  At a physical examination related to employment in May 2016, Plaintiff reported feeling "very good" with 0/10 pain.  (R. 382).  The physician opined that he could "continuously" engage in all work postures and carry over 100 pounds.  (R. 380).

### 2.    During the Relevant Period

Plaintiff's primary care and mental health providers treated Plaintiff throughout the relevant period, generally observing normal gait and station, muscle tone, and strength.  See, e.g., (R. 1021–22, 1026, 1031, 1035, 1042, 1152–53, 1159, 1275).  As of August and November 2020, Plaintiff was engaging in moderate intensity exercise for 150 minutes per week and muscle strengthening activities twice a week.  (R. 1140, 1154).  Plaintiff complained of knee pain at only two treatment appointments during the relevant period, which are discussed below.

On September 27, 2019, Plaintiff presented to Naval Medical Center Portsmouth complaining of sudden onset back pain after rotating his torso.  (R. 1280–81).  He was prescribed pain medication and instructed to follow up with his primary care physician.  (R. 1281).  His extremities displayed normal range of motion, he had no weakness, and his gait was normal.  (R. 1280).  He did not mention knee pain.  See (R. 1280–81).  However, when he followed up with his primary care physician approximately one week later, on October 4, 2019, he also complained of bilateral knee pain.  (R. 1161).  On examination, Plaintiff had tenderness along the medial joint lines, an unspecified reduction in ranges of motion, and crepitus on motion.  (R. 1163–64).  But motion was painless, ambulation lacked tenderness, and McMurray tests[2] were negative.  Id.  A

---

[2] In a McMurray's test, "[t]he lower leg is rotated each way on the knee and the knee flexed.  If there is a meniscal tear a 'clunk' is said to be felt by the examiner's hand resting on the knee."  1 Medical Information System for Lawyers § 6:202 (2d ed.) (Aug. 2021).

Lachman test of each knee "did not demonstrate one plane anterior instability." Id. He was prescribed a topical gel for joint pain and recommended physical therapy. (R. 1166).

Approximately one year later, on September 30, 2020, during a telemedicine appointment, Plaintiff complained of right knee pain, which he said he had experienced "for many years," although he had "recently noticed more pain . . . ." (R. 1146). He denied lower extremity weakness, and a symptom review showed no gait abnormality or motor disturbances. Id. Plaintiff reported using the topical gel "off and on as needed." Id. He was directed to make an in-person appointment for knee pain evaluation, (R. 1148), but the record does not reflect a follow-up appointment or receipt of physical therapy.

**B.    Opinion Testimony**

**1.    Lisa Harris, M.D.**

In October 2020, Lisa Harris, M.D., performed a consultative examination. (R. 996–1002). Plaintiff reported a 15-year history of bilateral knee pain, with 7.5/10 right knee pain and 7/10 left knee pain. (R. 996) (reporting "flare" ups to 10/10). He said his "pain [was] relieved with pain medication and rest." Id. He conveyed that he could stand for 4 to 5 minutes, walk for 5 to 10 minutes, and stand for 20 minutes, and that his wife did all household chores. Id. He could dress, bathe, and feed himself. Id. Harris observed that Plaintiff's "[a]mbulation was slow, but normal," with a "[s]lightly antalgic gait." (R. 997). He displayed 110/150 right knee flexion and 120/150 left knee flexion, with normal bilateral extension. (R. 999). Both back and knee pain prevented him from walking heel-to-toe, but he could rise on both his heels and toes. (R. 997). Plaintiff's straight leg tests were negative bilaterally. Id. However, knee pain prevented squatting. Id.

Harris opined that Plaintiff could only walk or stand for up to 30 minutes during a normal workday. (R. 998). His sitting was unlimited, but he would "need to change his position for comfort." Id. He could lift or carry 10 pounds occasionally. Id.

### 2. State Agency Physicians

At initial review, Jack Hutcheson, M.D., opined that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently. (R. 135). He could stand, walk, and sit for six hours in an eight-hour workday. Id. Pushing and pulling was limited to frequent because of bilateral knee pain. Id. After reviewing medical records specific to Plaintiff's knee pain, Hutcheson assigned Plaintiff light work capabilities. (R. 135–36). He opined that Plaintiff could occasionally climb ramps and stairs, stoop, kneel, and crouch; frequently balance; but never climb ladders, ropes, and scaffolds, or crawl. (R. 136).

David Bristow, M.D., similarly found that Plaintiff could perform light work. (R. 154). He opined that Plaintiff could sit, walk, and stand for six hours a day, and that he "[m]ust periodically alternate sitting and standing to relieve pain and discomfort." Id. He opined that Plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, crawl; but never climb ladders, ropes, and scaffolds. (R. 155). Balancing was unlimited. Id.

### C. Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on May 10, 2021. (R. 49). The ALJ also heard testimony from the VE, Robert Edwards. Id.

### 1. Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that he lived in a two-story home with his bedroom on the second floor, but that he "usually sle[pt] on the first floor because . . . [he had] trouble making it up the stairs." (R. 66). He said that in 2017, Veteran Affairs ("VA") prescribed

6

him a cane because of arthritis in his right knee and back pain.  Id.  He said he could walk about

half a block, stand for 15 minutes, and lift 10 pounds. (R. 67–68).  He reported that his wife helped

him bathe because his knee and back pain prevented standing in the shower. (R. 67).

### 2.      Testimony from the VE

The VE characterized Plaintiff's prior work as a filter changer as medium and unskilled

(DOT 521.687-050).[3]  (R. 83).  The ALJ's hypothetical for the VE posited a person with the same

age, education, and work experience as Plaintiff with the following non-exertional limitations:

> I would limit this person to no more than occasionally having to climb.  This person
> should never be at unprotected heights or large, moving, mechanical parts.  In terms
> of understanding, remembering, and carrying out instructions, I would limit them
> to simple, routine tasks.  In terms of judgement, I would limit them to simple,
> routine tasks.  In terms of interactions with people, with supervisors, I would limit
> them to no more than frequent; coworkers, and the public no more than
> occasionally.  And in terms of dealing with workplace stressors or changes, they
> can make no more than simple, work-related decisions.  And their time off task
> would include the ability to perform simple, routine, and repetitive tasks.

(R. 86).  The VE testified that such a person could perform the filter changer job as generally

performed.  Id.

The ALJ also asked whether the hypothetical individual could "perform any other work

. . . at either [the] light or sedentary" level.  Id.  For light, the VE identified a sorter (DOT 222.687-

014) with 49,000 jobs nationally; clerical checker (DOT 222.687-010) with 34,000 jobs nationally;

and laundry folder (DOT 369.687-018) with 41,000 jobs nationally.  (R. 85, 87).  For sedentary,

the VE identified a document preparer (DOT 249.587-018) with 19,000 jobs nationally; addressing

clerk (DOT 209.587-010) with 18,000 jobs nationally; and electronics inspector (DOT 726.684-

050) with 39,000 jobs nationally.  (R. 87).

---

[3] Plaintiff also had past work as a radio or electronics intelligence operation specialist in the military (DOT
193.362-014) and the VE characterized his work for Uber as a taxi driver (DOT 913.463-018).  (R. 83).

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

Plaintiff's brief identifies three errors in the ALJ's decision that he claims warrants remand. He first contends that the ALJ's findings are not supported by substantial evidence because the

ALJ improperly evaluated the severity of his knee impairments, but as explained below, this Report finds no error in the ALJ's analysis. Plaintiff also raises two constitutional challenges, alleging that ALJ Flynn and the Appeals Council judges, as inferior officers, were not properly appointed, and that the removal provisions for the SSA commissioner violate separation of powers principles. As explained below, this Report finds that Plaintiff's constitutional arguments lack merit. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

A.    **Framework for SSA Disability Evaluation**

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 404.1520(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.    Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.    Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.    Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3); 404.1520b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from August 1, 2019, his amended alleged disability onset date, until the hearing date. (R. 14). At step

10

two, the ALJ found that Plaintiff suffered from the following severe impairments: PTSD and bipolar disorder. Id. She did not find that Plaintiff suffered from a severe impairment related to his bilateral knee pain and low back pain, which Plaintiff alleged "impair[ed] his ability to sit, stand, walk, lift, and carry." (R. 15).

At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 16). The ALJ developed a finding regarding Plaintiff's RFC, determining that Plaintiff was able "to perform a full range of work at all exertional levels" with several non-exertional limitations. (R. 21). At step four, the ALJ concluded that Plaintiff could perform past relevant work as a filter changer. (R. 25). Plaintiff was thus not disabled. (R. 27).

## C.   The ALJ's Evaluation of Plaintiff's Knee Impairments Is Supported by Substantial Evidence.

Plaintiff's only substantive challenge concerns whether the ALJ correctly applied Step Two of the sequential analysis in finding that the degenerative joint disease in his knees was not severe. Pl.'s Mem. (ECF No. 12, at 3). Plaintiff argues that the record evidence met the "de minimis screening standard" and the ALJ should have found that his impairments were severe. Id. Defendant argues that "the ALJ reasonably concluded that Plaintiff's knee impairments were not severe because they did not result in significant work-related limitations." Def.'s Opp'n (ECF No. 14, at 26). As discussed below, the ALJ's decision is supported by substantial evidence.

### 1.   The ALJ's Step Two analysis is supported by substantial evidence.

At Step Two of the sequential evaluation process, a claimant must show a severe, medically determinable impairment of sufficient duration which "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c); see also § 404.1520(a)(4)(ii). An ALJ must "consider all of [the claimant's] medically determination

11

impairments," including non-severe impairments.  § 404.1545(a)(2).  However, if a non-severe impairment "do[es] not actually create functional limitations on a claimant's ability to do work," the ALJ is not required to modify the RFC.  Perry v. Colvin, No. 2:15-CV-01145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016); see also Presnell v. Colvin, No. 1:12-CV-299-FDW, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013).

The record supports the ALJ's finding that Plaintiff's knee impairments were non-severe. (R. 23).  Evidence before the ALJ indicates that, shortly before his hearing, Plaintiff regularly engaged in moderate intensity exercise for 150 minutes per week. (R. 1140, 1154).  He had normal gait and station, muscle tone, and strength throughout the relevant timeframe. See, e.g., (R. 1021–22, 1026, 1031, 1035, 1042, 1152–53, 1159, 1275).  He also only complained of active knee pain at two medical appointments. (R. 1146, 1161).  Although he was prescribed topical gel for joint pain, (R. 1166), he only used it "off and on as needed," (R. 1146).  He was recommended physical therapy, (R. 1166), and a follow-up appointment for knee pain evaluation, (R. 1148), but he did not pursue these treatments.  Thus, the record supports that Plaintiff was not severely impacted.

As the ALJ acknowledged, an October 2019 appointment displayed "some objective abnormalities." (R. 15).  At that appointment, Plaintiff's rated his pain as 7/10, (R. 1161), and he had tenderness along the medial joint lines of his knee, (R. 1163–64).  His range of motion in his spine and knees was reduced, and his knees had crepitus on motion. Id.  And Plaintiff's x-rays, taken in 2016, noted that his osteoarthritis was "slightly worsened from previous exam." (R. 394); see also (R. 1073) (showing osteoarthritis and some small bilateral knee effusions).  But it is not enough for Plaintiff to show "deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) (relying on Baeder v. Heckler, 768 F.2d 547, 551 (3rd Cir. 1985)).  Plaintiff must establish that any medical deviations

12

affect his ability to work. Id. Other objective findings at the same October 2019 appointment support that Plaintiff could work without impairment, including that "[n]o pain was elicited by motion" in either of Plaintiff's knees. (R. 1163–64). Indeed, he could walk without tenderness in his knees. Id. Testing also did not reveal any meniscal tears or instability. Id. Thus, the ALJ's finding that the knee impairments were not severe is adequately supported.

Plaintiff characterizes Step Two as being "highly deferential" in nature. Pl.'s Mem. (ECF No. 12, at 5). As explained in McCrea v. Commissioner of Social Security, this step generally imposes a low evidentiary burden:

> Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.

370 F.3d 357, 360 (3d Cir. 2004) (first quoting SSR 85–28, 1985 WL 56856, at *3 (Jan. 1, 1985); and then citing Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546, 546–47 (3d Cir. 2003)) (cleaned up). However, there still must be a showing that the impairment has some effect on the claimant's ability to work. Cf. Bowen v. Astrue, No. 8:09-2694-MBS-BHH, 2010 WL 6363022, at *4 (D.S.C. Dec. 28, 2010) (noting that the ALJ "does not dispute the credibility of the impairment[']s presence but simply the degree of its effect on the plaintiff's ability to function"), R. & R. adopted by 2011 WL 1163502 (D.S.C. Mar. 29, 2011). As discussed above, the ALJ's findings that his knee impairments did not affect his work ability are supported. Although the burden is slight, Plaintiff has not met it here.

Plaintiff's testimony about his limitations also does not support his claim at Step Two. Cf. Kirk v. Comm'r of Soc. Sec., 177 F. App'x 205, 207 n.3 (3d Cir. 2006) (finding that "self-serving allegations of debilitating anxiety[,] . . . standing alone, are insufficient to sustain the claimant's burden of showing a severe impairment"). Plaintiff relies on his own representation he had

13

difficulty climbing stairs and slept on the first floor of his home. Pl.'s Mem. (ECF No. 12, at 5) (citing R. 66–68). But this is insufficient. Plaintiff's burden at Step Two requires more substantive evidence, and the ALJ was justified to the extent she discounted his testimony. See (R. 15).

Moreover, any error regarding Plaintiff's knee impairments is harmless because ALJ Flynn did not deny Plaintiff's application based entirely upon Step Two. Instead, she continued with the five-step evaluation process. See (R. 16–27). In McCrea, the ALJ denied benefits outright at step two, which the court "reviewed with close scrutiny." McCrea, 370 F.3d at 360 (clarifying that "a more stringent standard of review" was not required). Other courts, however, recognize that proceeding with the evaluation process makes a Step-Two error more likely to be harmless. See Booker v. Colvin, No. 14-4984, 2017 WL 914911, at *5 n.8 (E.D. Pa. Mar. 7, 2017) (finding when ALJ dismissed mental impairments as non-severe but evaluated physical impairments, "any alleged error on the part of the ALJ in assessing the severity of Plaintiff's mental impairments is harmless"); Wear v. Comm'r of Soc. Sec., No. 11-901, 2012 WL 2679455, at *6 (W.D. Pa. Apr. 30, 2012) (distinguishing McCrea on the basis that ALJ continued with analysis), R. & R. adopted by 2012 WL 2700496 (W.D. Pa. July 6, 2012). While the ALJ did not find that Plaintiff's knee limitations were severe, she found other severe impairments of PTSD and bipolar disorder. (R. 14). And she expressly considered even the non-severe impairments in arriving at Plaintiff's RFC. (R. 21). She found Plaintiff capable of performing past relevant work. (R. 25). The ALJ thoroughly engaged with the evidence, and her severity finding at Step Two does not require remand.

### 2. The RFC is supported by substantial evidence.

Although Plaintiff does not directly challenge the RFC, I observe that the RFC is also supported by substantial evidence. See Pl.'s Mem. (ECF No. 12, at 3). An ALJ must consider non-severe impairments in developing the RFC. Britt v. Saul, 860 F. App'x 256, 262 (4th Cir.

2021).  But consideration is all that is required.  Id.  An ALJ satisfies this responsibility by explaining why an impairment is non-severe at Step Two, and he is not required to "repeat himself" in the RFC analysis.  Id.  In this case, the ALJ explicitly incorporated her Step Two analysis in the RFC analysis.  See (R. 23).  She found exertional limitations inappropriate "[e]ven considering the claimant's nonsevere impairments," like his alleged knee impairments.  Id.  In fact, as previously cited, he generally had normal gait and station.  See, e.g., (R. 1021–22, 1026, 1031, 1035, 1042, 1152–53, 1159, 1275).  The RFC is thus supported by substantial evidence.

### 3.    The ALJ adequately considered the medical opinion evidence.

Plaintiff argues that the ALJ improperly evaluated opinion evidence from state agency medical consultants, Hutcheson and Bristow, as well as the consultative examiner, Harris.  Pl.'s Mem. (ECF No. 12, at 5–6).  The medical consultants opined that Plaintiff could only perform light work.  (R. 135–36, 154–56).  Harris opined that Plaintiff could not stand or walk for more than 30 minutes, would need to change seated positions, and could not lift or carry more than 10 pounds.  (R. 998).  The ALJ rejected these opinions as unpersuasive, (R. 24–25), which Plaintiff contends is error, Pl.'s Mem. (ECF No. 12, at 5–6).  Because the ALJ appropriately evaluated the medical and state agency opinions as required by the applicable regulations,[4] remand is not required.

Under the rules, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ."  20 C.F.R. § 404.1520c(a).  Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the

---

[4] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff filed his claim on November 22, 2019, (R. 11), the new rules apply.

most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2). The ALJ discounted the state agency medical consultants' and consultative examiner's opinions because they were unsupported by Plaintiff's treatment records and inconsistent with the record as a whole, (R. 24–25), which finding is supported by substantial evidence.

### a.    The ALJ appropriately weighed Harris's opinion.

The ALJ appropriately found that Harris's "mostly benign findings" did not support her restrictive medical opinion. (R. 24). Plaintiff criticizes the ALJ's interpretation of medical evidence as benign "when not a single other medical professional of record shared that opinion." Pl.'s Mem. (ECF No. 12, at 8). But this case is not like those in which the ALJ's assessment contradicts the weight of medical evidence. Cf. Lewis, 858 F.3d at 869 (finding designation of "treatment as 'conservative'" was improper by claimant received extensive medical treatment). Harris's findings were objectively mild. Although his movement was slow, Plaintiff walked normally with only a "[s]lightly antalgic gait." (R. 997). He could "get on and off of the examination table, up and out of a chair," and he told Harris that he could "dress and undress himself." Id. He did have some limited range of motion from knee and back pain, (R. 997, 999), but his straight leg tests were negative bilaterally, and he was able to rise on both his heels and his toes. (R. 997). Plaintiff reported that his "pain [was] relieved with pain medication and rest." (R. 996). The ALJ's finding that Harris's opinion was unsupported by her examination record is thus supported.

Regarding consistency, the ALJ also appropriately found that Harris's opinion was "inconsistent with the lack of significant findings elsewhere and no mention of the use of an assistive device." (R. 24). Other treatment notes do not support that Plaintiff would have difficulty working because of his knee impairments. His mental health providers routinely noted during their examinations that he had normal gait and station, muscle tone, and strength. (R. 1021–22, 1026, 1035, 1042, 1275). His primary health provider also noted that his gait and stance were "normal." (R. 1153, 1159). And, as explained above, he only complained of active knee pain at two medical appointments and did not pursue additional treatment. (R. 1146, 1161). When he presented to the emergency room in September 2019 for back pain, he did not even mention knee pain, and he displayed normal range of motion, he had no weakness, and his gait was normal. (R. 1280–81). The ALJ's analysis of Harris's opinion was thus adequately supported.

Plaintiff contends that the ALJ could not rely upon Harris's failure to mention an assistive device as probative of her opinion's supportability. Pl.'s Mem. (ECF No. 12, at 8). He accuses the ALJ of failing to provide a "logical explanation" for her conclusion because Plaintiff "did not need his cane all the time." Id. (first citing Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019); and then citing (R. 15)). However, the requirement is that an ALJ must "provide a coherent basis" for a determination. Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018); see also Thomas, 916 F.3d at 311 (clarifying that the "logical explanation" permits the court "to conduct meaningful appellate review"). As discussed above, the ALJ's overall assessment of Harris's opinion is supported. Further, when Harris reviewed Plaintiff's medical history with him, even occasional use of a cane was not mentioned. See (R. 996). The only record of an assistive device before the court is Plaintiff's own testimony to the ALJ that the VA prescribed him a cane in 2017. (R. 66).

17

Thus, Harris did not consider Plaintiff's use of any assistive device when developing her restrictive opinion, which reasonably undermines its supportability.

       **b.**    **The ALJ appropriately weighed opinions from the state agency medical consultants.**

    The ALJ found that Hutcheson's and Bristow's opinions were unsupported and inconsistent with the evidence. (R. 25). The ALJ referenced her extensive discussion throughout the opinion on how Plaintiff's "physical impairments d[id] not cause him more than minimal functional limitations." Id. The ALJ's decision is considered as a whole, and the ALJ is not required to cite all applicable evidence in every portion of the opinion. See Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011) (reviewing "the ALJ's decision as a whole"); McCartney v. Apfel, 28 F. App'x 277, 279 (4th Cir. 2002) (agreeing "that the ALJ need only review medical evidence once in his decision"); see also Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (finding ALJ is not required to "specifically refer to every piece of evidence" (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). As detailed above, Harris's mild examination findings do not support that Plaintiff's ability to work would be severely impacted, and other treatment notes showed normal gait and station. See, e.g., (R. 1021–22, 1026, 1031, 1035, 1042, 1152–53, 1159, 1275). The ALJ's analysis was sufficient and supported by substantial evidence.

    Plaintiff articulates ways in which Harris's and Bristow's opinion are consistent with one another. Pl.'s Mem. (ECF No. 12, at 6–7). Specifically, both sources opined that Plaintiff would need to adjust positions throughout the day. (R. 154, 998). However, this amounts to a request that the court reweigh the evidence. The court must defer to the ALJ's findings if supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as

to whether [Plaintiff] is disabled," then the court defers to the ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). An appeal must focus instead on whether the reasons the ALJ gave for discounting each source's opinion—the reasons the ALJ found them inconsistent with the evidence—are supported.

Plaintiff argues that "the ALJ rejected every single medical opinion regarding [his] physical abilities based on her own perception of the evidence." Pl.'s Mem. (ECF No. 12, at 7). An ALJ who mischaracterizes medical evidence may err. Cf. Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (finding that an ALJ is "not qualified to interpret raw medical data in functional terms" without a medical opinion); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (remanding because "the ALJ did not cite any medical evidence to dispute the treating physicians' conclusions").[5] But an RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." Felton-Miller v. Astrue, 459 F. App'x 226, 230–31 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Therefore, any "argument that the ALJ's finding is not supported by substantial evidence because the ALJ is a layman and did not obtain an expert medical opinion . . . is without merit." Id. at 230. As discussed above, the ALJ appropriately evaluated the medical evidence and medical testimony under the regulations. Her opinion is thus supported by substantial evidence.

---

[5] The only Fourth Circuit case Plaintiff cites applies the defunct legal standard that treating physician opinions cannot be disregarded "in the absence of some persuasive contrary evidence . . . ." Mitchell v. Schweiker, 699 F.2d 185, 186 (4th Cir. 1983); see also Gallardo v. Berryhill, No. 1:16CV355, 2017 WL 1409575, at *4 (M.D.N.C. Apr. 20, 2017) (explaining that this "phrasing of the 'treating physician rule' no longer represents the governing standard"), R. & R. adopted by 2017 WL 2623884 (M.D.N.C. June 16, 2017). In fact, the treating physician rule has been entirely replaced. See supra note 4.

4.      **Harmless Error**

Lastly, Plaintiff simply cannot establish that he was harmed by the ALJ's failure to

designate his knee impairments as severe:

> When confronted with an error committed by the ALJ, the Court must determine
> whether to apply the harmless error doctrine. The burden of establishing a harmful
> error rests on the party attacking the agency's determination. In determining the
> significance of an error, courts must consider, among other factors, an estimation
> of the likelihood that the result would have been different.

Ross v. Berryhill, No. 3:18-CV-42, 2019 WL 289101, at *12 (E.D. Va. Jan. 3, 2019), R. & R.

adopted by 2019 WL 281191 (E.D. Va. Jan. 22, 2019) (cleaned up); see also Shinseki v. Sanders,

556 U.S. 396, 407 (2009).  The ALJ did not assign any exertional limitations in the RFC. (R. 21).

However, the ALJ found that Plaintiff's work ability "ha[d] been compromised by nonexertional

limitations," and asked the VE to identify additional positions.  (R. 26–27, 85, 87).  The VE

identified six occupations that Plaintiff could still perform, three of which were light and three of

which were sedentary.  Id.  Even if the ALJ had credited Plaintiff's knee impairments, he would

still have been eligible for work at either of these categories.  See 20 C.F.R. § 416.967(a)–(b).

Thus, the ALJ would have found sufficient work within the national economy that Plaintiff could

perform.  Plaintiff would not have been found disabled in any case.

D.      **Plaintiff's Case Was Heard by a Validly Appointed ALJ Because Nancy Berryhill
        Was Properly Serving as Acting Commissioner Under the Federal Vacancy Reform
        Act of 1998 ("FVRA") When She Ratified the Appointments of SSA ALJs.**

Plaintiff challenges ALJ Flynn's ability to decide Plaintiff's claim under the Appointments

Clause, relying on Supreme Court precedent in Lucia v. SEC, 138 S. Ct. 2044 (2018).  See Pl.'s

Mem. (ECF No. 12, at 12) (citing Carr v. Saul, 141 S. Ct. 1352 (2021)).  In Lucia, the Court held

that ALJs employed by the Securities and Exchange Commission ("SEC") were inferior officers

of the United States subject to the Appointments Clause.  Lucia, 138 S. Ct. at 2055.  That clause

specifies "the permissible methods of appointing 'officers of the United States,' a class of

government officials distinct from mere employees." Id. at 2049 (citing U.S. Const. Art. II, § 2, cl. 2). Specifically, it requires such officers be appointed by the President, a court of law, or the head of a department. U.S. Const. Art. II, § 2, cl. 2; see also Jones Bros. v. Sec'y of Labor, 898 F.3d 669, 676 (6th Cir. 2018) (citing id.). Because the SEC ALJ was not a mere employee but an officer whose appointment required action by the President, a court of law, or a department head, his appointment was defective and his action a nullity. See Lucia, 138 S. Ct. at 2055. Following Lucia, many Social Security claimants raised similar challenges to the appointment of ALJs adjudicating their claims. And in 2021, the Court held such claims could proceed in federal court even if claimants had not raised any objection to the appointment during administrative proceedings. Carr, 141 S. Ct. 1352.

Nancy Berryhill, as Acting Commissioner of the SSA, resolved these Appointment Clause concerns by confirming the appointments of all SSA ALJs, including ALJ Flynn. Berryhill also "took the same actions with respect to the administrative appeals judges . . . who work at the Appeals Counsel."[6] SSR 19-1(p), 2019 WL 1324866, at *2 (Mar. 15, 2019). Berryhill began serving as Acting Commissioner on January 21, 2017,[7] when the offices of Commissioner and Deputy Commissioner became vacant. On April 17, 2018, President Donald Trump nominated Andrew Saul as Commissioner of the SSA. The month after Lucia, on July 16, 2018, Berryhill

---

[6] Ratification is an appropriate method of curing Appointment Clause challenges like this one. See Ramsey v. Comm'r of Soc. Sec., 973 F.3d 537, 547 n.5 (6th Cir. 2020) (observing "[a]s an initial matter, the Commissioner's ratification of SSA ALJs has cured any Appointments Clause problem with SSA ALJs"), cert. denied sub nom. Saul v. Ramsey, 141 S. Ct. 2699 (2021). Plaintiff does not challenge that a properly appointed SSA Commissioner had the authority to ratify the SSA judges' appointments or that ratification could cure the constitutional issue.

[7] The District of Minnesota designed visual graphics of Berryhill's service. See Brian T.D. v. Kijakazi, No. 19-cv-2542, 2022 WL 179540, at *8 (D. Minn. Mar. 23, 2022). Facts regarding Berryhill's dates of service, which are not in dispute, are taken from this opinion and Defendant's brief. See Def.'s Opp'n (ECF No. 14, at 10).

ratified the SSA ALJs' appointments. See SSR 19-1(p), 2019 WL 1324866, at *2.  Plaintiff argues

that, because Berryhill ratified ALJ Flynn's and the Appeals Counsel's appointments "more than

210 days after Ms. Berryhill became Acting Commissioner, she no longer had any legal authority

as Acting Commissioner under the FVRA to make such appointments."  Pl.'s Mem. (ECF No. 12,

at 12).  As discussed below, I conclude the FVRA permitted Berryhill to ratify the SSA judges'

appointments on July 16, 2018, because she was "serving as an acting officer . . . for the period

that [Saul's] nomination [was] pending in the Senate."  5 U.S.C. § 3346(a), (a)(2).

**1.      Relevant potential interpretations of section 3346(a) of the FVRA.**

The FVRA authorizes certain officials to act during vacancies in Senate-confirmed offices.

See 5 U.S.C. §§ 3345, 3346; see also NLRB v. SW Gen., Inc., 137 S. Ct. 929, 934 (2017).  Section

3346(a) of the FVRA limits how long an acting official can execute the duties of a vacant office.

Under the statute,

> (a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> (1) for no longer than 210 days beginning on the date the vacancy occurs; or
>
> (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346(a).  It is uncontested that Berryhill initially served under subsection (a)(1) from

January 21, 2017, until November 16, 2017—or for 210 days—at which point her authority under

that subsection of the FVRA terminated.[8]  See Pl.'s Reply (ECF No. 18, at 4).

---

[8] Plaintiff's reply brief implies an argument about Berryhill's position during the interim period between November 2017 and April 2018, after the 210 days expired and before Saul's nomination was submitted. See, e.g., Pl.'s Reply (ECF No. 18, at 5) (arguing that Saul's nomination "did not somehow magically eliminate the fact that Ms. Berryhill had already long been illegally occupying the position of agency head of SSA at the time that [Saul's] nomination was made"); id. (referring to a "fiction that this person had vacated their office for some period of time, even though that never occurred").  However, because Berryhill

However, parties dispute whether subsection (a)(2) permitted Berryhill to resume her role as Acting Commissioner after President Trump submitted Saul's nomination to the Senate on April 17, 2018.  Defendant argues that subsection (a)(2) authorizes two distinct periods of service, and thus it operates to allow an acting official to resume the duties of a vacant office after a nomination even if a previous acting term under subsection (a)(1) had expired.  Def.'s Opp'n (ECF No. 14, at 10–16).  Adopting the District of Minnesota's reasoning in Brian T.D. v. Kijakazi, No. 19-cv-2542, 2022 WL 179540 (D. Minn. Mar. 23, 2022),[9] Plaintiff argues that subsection (a)(2) extends an Acting Commissioner's authority only if the Senate receives a Presidential nomination during the initial 210-day period authorized in subsection (a)(1).  Pl.'s Mem. (ECF No. 12, at 13) ("Plaintiff offers the exact same arguments here as the claimant in that case."); see also Brian T.D., 2022 WL 179540, at *12 ("This section extends that initial period of service if, during that 210 days, a nominee for the office is named.").  As explained below, the plain language and legislative history of the FVRA confirm that Berryhill could resume her service after Saul's nomination was submitted notwithstanding the fact that her original 210-day period expired before the Senate received his nomination.

### 2.    The plain text of the FVRA indicates that Berryhill could resume her position as Acting Commissioner of the SSA after Saul's nomination.

Statutory interpretation always "begins with the text." Ross v. Blake, 578 U.S. 632, 638 (2016).  "It is well established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." Crespo v. Holder, 631 F.3d 130, 133 (4th Cir. 2011) (quoting Lamie v. United States Tr., 540 U.S. 526, 534 (2004)).  Terms are given "their

---

ratified ALJ Flynn's appointment on July 16, 2018, after Saul's nomination, the question of whether any prior service was authorized or undertaken during this interim timeframe is not relevant here.

[9] Brian T.D. is currently on appeal to the Eighth Circuit. Dahle v. Kijakazi, No. 22-1601 (8th Cir. 2022).

ordinary, contemporary, common meaning, absent an indication Congress intended it to bear some different import." Id. (quoting N.C. ex rel. Cooper v. Tenn. Valley Auth., 515 F.3d 344, 351 (4th Cir. 2008)) (cleaned up). The plain language of section 3346(a) is most plausibly read as creating two independent periods of acting service.

I first look at the connection between subsections (a)(1) and (a)(2). The term "or," preceded by a semicolon, joins the two provisions. 5 U.S.C. § 3346(a)(1). This connector has been the subject of much interpretative guidance:

> The disjunctive "or" usually . . . separates words or phrases in the alternate relationship, indicating that either of the separated words or phrases may be employed without the other. The use of the disjunctive usually indicates alternatives and requires that those alternatives be treated separately.

1A Sutherland Statutory Construction § 21:14 (7th ed.) (emphasis added); see also Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (holding that "or" creates alternatives that should be allowed their "independent and ordinary significance," and that "terms connected by a disjunctive [should] be given separate meanings"); George Hyman Const. Co. v. Occupational Safety & Health Rev. Comm'n, 582 F.2d 834, 840 n.10 (4th Cir. 1978) (confirming that "use of a disjunctive indicates alternatives and requires they be treated separately"). If the two subsections are independent alternatives, then subsection (a)(2) cannot "suspend" the 210-day time limitation in subsection (a)(1). See Brian T.D., 2022 WL 179540, at *13. The second provision simply cannot affect the first, supporting that the acting official "may serve in the office" in two—not necessarily related—scenarios. 5 U.S.C. § 3346(a).

Although disjunctive, "or" is also "usually inclusive." Tex. Std. Oil Co. v. Forest Oil Corp., No. CV G-05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, Dictionary of Modern Legal Usage 624 (2d ed. 1995)); see also Varga v. Colvin, 794 F.3d 809, 815 (7th Cir. 2015) ("The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive

one (A or B, not both)." (citing Garner Dictionary of Legal Usage 639 (3d ed.)).  As Defendant

explains, "if a server comes to a table and asks whether anyone would like 'dessert or coffee,' no

one would interpret that to preclude ordering both." Def.'s Opp'n (ECF No. 14, at 11 n.3).  Under

an inclusive interpretation of these subsections, Berryhill was not restricted to serve only once.

Instead, she could serve under subsection (a)(2) even after exhausting her service under subsection

(a)(1).

   Although the term "or" is a compelling indicator of Congress's intent, the statute's

substantive language is similarly plain.  Subsection (a)(1) extends authority "beginning on the date

the vacancy occurs," while subsection (a)(2) extends authority "from the date of [the presidential]

nomination . . . ." 5 U.S.C. § 3346(a).  These are unique triggering events, authorizing separate

periods of service.  The subsections also specify different lengths of authorized service, with

subsection (a)(1) limiting service to 210 days, while subsection (a)(2) extends authority "for the

period that the nomination is pending in the Senate." Id.  Subsection (a)(2) interplays with

subsection (b), which clarifies what authority is permissible depending on Senate approval or

rejection. See § 3346(b).  The fact that Congress provided these details within each subsection

underscores that their terms do not modify each other.

   The statute also fails to "mention any requirement that a nomination be submitted within

the initial 210-day period." Def.'s Opp'n (ECF No. 14, at 11).  Courts "ordinarily resist[] reading

words or elements into a statute that do not appear on its face." Dean v. United States, 556 U.S.

568, 572 (2009) (quoting Bates v. United States, 522 U.S. 23, 29 (1997)); see also Va. Uranium,

Inc. v. Warren, 139 S. Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress

wrote but, as importantly, what it didn't write.").  Congress could have made such a requirement

explicit. Cf. 28 U.S.C. § 1367(d) (tolling the limitations period); 38 U.S.C. § 3103(b)(1)

(preventing eligibility period from running under certain conditions). And indeed, within the FVRA, Congress required that subsection (a)(1)'s limitation period begin either 90 days after the inauguration or after the vacancy occurs. See 5 U.S.C. § 3349a(b) (discussing vacancies that exist during Presidential transitions). Considering that Congress could have explicitly required nomination before the 210 days expired, I do not find it prudent to read in such a requirement now.

Lastly, Brian T.D. misreads the import of section 3346(a)'s prefatory language. The Magistrate Judge placed great weight on the present participle "serving," finding that "the section applies to the person presently serving in that capacity and not to the person who had previously served as Acting Commissioner." Brian T.D., 2022 WL 179540, at *11. But the word "presently" does not appear in the full provision, which refers to "the person serving as an acting officer as described under section 3345 . . . ." 5 U.S.C. § 3346(a) (emphasis added). A court "should give effect . . . to every word that Congress has used in a statute." Conn. Dept. of Income Maint. v. Heckler, 471 U.S. 524, 530 n.15 (1985) (citing Reiter, 442 U.S. at 339). When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of "present service." Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FVRA.[10] This prevents section 3346(a)'s timing limitations from unintentionally applying to other vacancy statutes. See, e.g., 42 U.S.C. § 902(b)(4) (SSA specific vacancy statute); United States v. Smith, 962 F.3d 755, 763 n.1 (4th Cir. 2020) (observing that statutes "ordinarily supply an alternative to the FVRA, but not a mutually exclusive one"). It thus serves a clear purpose— but not the purpose that Brian T.D. assigned to it. Cf. Healthkeepers, Inc. v. Richmond Ambulance

---

[10] Berryhill was initially authorized to act pursuant to 5 U.S.C. § 3345(a) under the FVRA, and thus is the type of officer to whom this statute would apply. In 2016, President Barack Obama established an order of succession for the SSA if the offices of Commissioner and Deputy Commissioner became simultaneously vacant. 81 Fed. Reg. 96,337 (Dec. 23, 2016). The memorandum designated the Deputy Commissioner for Operations, which was Berryhill's position on the date that Carolyn Colvin resigned.

Auth., 642 F.3d 466, 472 (4th Cir. 2011) (referencing the "canon of statutory interpretation which states that to the extent possible, a court's interpretation should ensure that the statutory scheme is coherent and consistent" (quoting Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 222 (2008)) (cleaned up)).   Thus, section 3356(a) does not prevent Berryhill from serving as Acting Commissioner under subsection (a)(2) merely because she was not currently serving a term under subsection (a)(1) when the (a)(2) triggering event of nomination occurred.

### 3.   The legislative history confirms Congress's intent that subsection (a)(2) authorize a separate period of acting service.

Courts ordinarily do not consider legislative history unless the text is ambiguous.  See Lee v. Norfolk S. Ry. Co., 802 F.3d 626, 631 (4th Cir. 2015) ("If the plain language is unambiguous, we need look no further." (citing Ignacio v. United States, 674 F.3d 252, 254 (4th Cir. 2012)). Although I find the plain language to be unambiguous here, reviewing the strong legislative history reinforces that Congress intended a person in Berryhill's position to serve under the FVRA in both subsection (a)(1) and (a)(2) scenarios. The Senate committee report explained the following: "The acting officer may serve even if the nomination is submitted after the 150 days[11] has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted." S. Rep. No. 105-250, at 14 (1998).  This is precisely the "spring-back" interpretation for which Defendant advocates here, and it conforms with the plain language as outlined above.

This interpretation also conforms with the legislative purpose.   In Brian T.D., the Magistrate Judge emphasized that his interpretation "incentivizes the President to promptly nominate someone to fill the vacant office to ensure the office's functions and duties continue to be performed." Brian T.D., 2022 WL 179540, at *12.  But the Senate Report opined that section

---

[11] 150 days was adjusted to 210 days in the FVRA's final version.  5 U.S.C. § 3346(a).

3346(a), with the spring-back interpretation, still "create[s] an incentive for the President to submit a nomination." S. Rep. No. 105-250, at 14. The proverbial[12] "stick" portion of the incentive—the prohibition on service after 210 days—only needs to operate until the President complies by submitting a nomination. Once that objective is achieved, the spring-back provision is a "carrot," allowing an individual like Berryhill to manage the federal agency during the pendency of the nomination, which can be a lengthy period. See id. ("The Committee extends the time period for acting service so as to create an incentive for the President to submit a nomination." (emphasis added)). Therefore, the need to incentivize swift nomination in no way conflicts with—and indeed is consistent with—a spring-back provision.

As Defendant emphasizes, the Executive Branch has interpreted subsection 3346(a)(2) as a spring-back provision since the FVRA's enactment. Def.'s Opp'n (ECF No. 14, at 13). In a 1999 opinion, the Office of Legal Counsel explicitly interpreted subsection (a)(2) to contain a spring-back provision:

> The Vacancies Reform Act incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted. If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative. . . . If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.

Guidance on Application of Federal Vacancies Reform Act of 1998, 23 U.S. Op. O.L.C. 60, 68, 1999 WL 1262050 (Mar. 22, 1999). The Government Accountability Office, while enforcing

---

[12] "Two common tools the government uses to influence behavior in contexts in which voluntary choice is the baseline are so-called 'carrots and sticks.' The government offers carrots, or government benefits, to induce desired behavior, and uses sticks, or penalties, to deter undesired behavior." Apache Stronghold v. United States, No. 21-15295, 2022 WL 2284927, at *24 (9th Cir. June 24, 2022) (quoting Stephanie Hall Barclay & Michalyn Steele, Rethinking Protections for Indigenous Sacred Sites, 134 Harv. L. Rev. 1294, 1301, 1326 (2021)) (cleaned up) (J., Berzon, dissenting).

compliance with section 3356(a), has also interpreted the FVRA to include a spring-back provision. See, e.g., Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998—Department of Energy, Director of the Office of Science, B-328888 (Mar. 3, 2017), https://www.gao.gov/assets/b-328888.pdf (last accessed July 6, 2022). In addition to the textual analysis already set forth, this is persuasive evidence that subsection (a)(2) allowed Berryhill to resume her service after Saul's nomination.

I am not alone in rejecting Brian T.D.'s interpretation. Other courts in the Fourth Circuit have also found it unpersuasive.[13] See Williams v. Kijakazi, No. 1:21-CV-141-GCM, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (observing that "Brian T.D. . . . is an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and Legislative Branch"); Early v. Kijakazi, No. 5:21-CV-00096-KDB, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) (recognizing Brian T.D. but agreeing that subsection (a)(2) contains a spring-back provision). As discussed above, the plain language and legislative history of section 3346(a) authorized Berryhill to serve as Acting Commissioner of the SSA once President Trump submitted Saul's nomination to the Senate, making her ratification of ALJ Flynn's appointment, and that of the Appeals Council judges, a valid and constitutionally permissible action under the Appointments Clause.

---

[13] Defendant makes an additional argument that even if "Berryhill was not validly serving as Acting Commissioner when she ratified the appointment of SSA ALJs, Plaintiff is not automatically entitled to a new hearing." Def.'s Opp'n (ECF No. 14, at 17). Defendant identifies that there were no alternative decisionmakers, and thus even Lucia would have permitted the ALJs to act. Id. at 17–19. Because I find that Berryhill was properly appointed, I do not reach this argument.

**E.**   **Plaintiff Is Not Entitled to a Rehearing on His Disability Claim Under the Separation-of-Powers Principle of the U.S. Constitution Because He Was Not Harmed.**

Plaintiff bases a second constitutional challenge on Seila Law LLC v. Consumer Financial Protection Bureau, 140 S. Ct. 2183 (2020).  In that case, the Supreme Court held that Congress violated constitutional separation-of-power principles by establishing an executive agency, the Consumer Financial Protection Bureau ("CFPB"), that was headed by a single director removable only for cause and who served a longer term than the President. Id. at 2191, 2211.  Like the CFPB, the SSA is headed by a single director who serves for six years and can only be removed for cause. See 42 U.S.C. § 902(a)(3).  Defendant concedes that this structure "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." Def.'s Opp'n (ECF No. 14, at 20); see also Office of Legal Counsel, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542, at *11 (July 8, 2021) (concluding "that the President may remove the SSA Commissioner at will" and "that disregarding the constitutionally unenforceable restriction on removal . . . would not affect the validity of the remainder of the statute").  However, because Plaintiff cannot show injury deriving from the SSA's removal structure, I do not reach this question. See Platt v. Comm'r of Soc. Sec., No. 20 Civ. 8382 (GWG), 2022 WL 621974, at *6 (S.D.N.Y. Mar. 3, 2022) (declining to reach arguments about at-will removal because plaintiff failed to show harm).

Plaintiff argues that Saul, the SSA Commissioner under whose delegated authority ALJ Flynn heard Plaintiff's case, lacked the proper authority to issue rules and regulations for adjudicating disability claims, depriving him "of a valid administrative adjudicatory process." Pl.'s Mem. (ECF No. 12, at 9–10).  But in Collins v. Yellen, the Supreme Court clarified that an unconstitutional removal structure did not inherently void the director's actions. 141 S. Ct. 1761, 1788 (2021) (stating that Seila Law never held "that the Director's action would be void unless

lawfully ratified"). Even with an unlawful removal provision, a director may "undertake the other responsibilities" of the office, id. at 1788 n.23, because "there was no constitutional defect in the statutorily prescribed method of the appointment to that office," id. at 1787. Plaintiff has not alleged that Saul's appointment was defective in any way. Thus, Plaintiff's argument that he is automatically entitled to remand is unavailing. See Pl.'s Mem. (ECF No. 12, at 12).

To obtain relief under Seila Law and Collins, a plaintiff must show that the "unconstitutional provision . . . inflict[ed] compensable harm." Collins, 141 S. Ct. at 1789. In her Collins concurrence, Justice Elena Kagan "agree[d] that plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision." Id. at 1801 (J., Kagan, concurrence). "[I]t is not difficult to see that Collins requires Plaintiff to prove that the decision denying his disability benefits was connected to 42 U.S.C. § 902(a)(3)," or the allegedly unlawful removal provisions. Burrell v. Kijakazi, No. CV 21-3662, 2022 WL 742841, at *5 (E.D. Pa. Mar. 10, 2022)).

Here, Plaintiff relies on the SSA Commissioner's tenure protection to set aside ALJ Flynn's decision.[14] As other courts have held, "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions." Decker Coal Co. v. Pehringer, 8 F.4th 1123, 1138 (9th Cir. 2021); see also Taffe v. Kijakazi, No. 20-CV-1974-WVG, 2022 WL 542884, at *9–11 (S.D. Cal. Feb. 22, 2022) (failing to find any "fathomable direct nexus").[15]

---

[14] While operation of law renders the benefits determination "the final decision of the Commissioner," see generally 42 U.S.C. § 423, the Commissioner does not personally review the factual determinations.

[15] Defendant cites over 25 district court opinions that have "rejected remands predicate on the Social Security Act's removal restriction for lack of compensable harm." Def.'s Opp'n (ECF No. 14, at 22 n.9). These include Michael H. v. Comm'r of Soc. Sec., No. 1:20-CV-1466-DB, 2022 WL 768658, at *15–18 (W.D.N.Y. Mar. 14, 2022); Tucker v. Kijakazi, No. 21-60943, 2022 WL 742744, at *2–3 (S.D. Fla. Mar. 11, 2022); Burrell v. Kijakazi, No. 21-3662, 2022 WL 742841, at *5 (E.D. Pa. Mar. 10, 2022); Platt v.

Plaintiff has not attempted to prove the nexus between the removal provision and ALJ Flynn's decision here. <u>See</u> Pl.'s Mem. (ECF No. 12, at 10–12); <u>see also</u> Pl.'s Reply (ECF No. 18) (failing to address Defendant's arguments). He has not identified any "defective regulations [that] were promulgated in this case, how they applied to his claim, and how they affected the outcome such that he suffered a compensable harm." <u>Michael H. v. Comm'r of Soc. Sec.</u>, No. 1:20-CV-1466-DB, 2022 WL 768658, at *18 (W.D.N.Y. Mar. 14, 2022). Rather, his "allegations merely amount to general dissatisfaction with the outcome of the adjudication of his claim." <u>Id.</u> Remand is not warranted.

---

Comm'r of Soc. Sec., No. 20 Civ. 8382 (GWG), 2022 WL 621974, at *5–6 (S.D.N.Y. Mar. 3, 2022); <u>Juliana Jolean A. v. Kijakazi</u>, No. 5:20-cv-1268, 2022 WL 595361, at *2–5 (N.D.N.Y. Feb. 28, 2022); <u>Jason V. v. Comm'r of Soc. Sec.</u>, No. C21-5527-SKV, 2022 WL 575703, at *5–7 (W.D. Wash. Feb. 25, 2022); <u>Colbert v. Comm'r of Soc. Sec.</u>, No. 5:20-CV-2234, 2022 WL 556738, at *2 (N.D. Ohio Feb. 24, 2022); <u>Kathy R. v. Kijakazi</u>, No. 2:21-cv-00095-JDL, 2022 WL 42916, at *3–5 (D. Me. Jan. 5, 2022), <u>R. & R. adopted by</u> 2022 WL 558359 (D. Me. Feb. 24, 2022); <u>Kreibich v. Kijakazi</u>, No. 20-cv-1045-bbc, 2022 WL 538261, at *6 (W.D. Wis. Feb. 23, 2022); <u>Taffe v. Kijakazi</u>, No. 20-CV-1974-WVG, 2022 WL 542884, at *9–11 (S.D. Cal. Feb. 22, 2022); <u>Kowalski v. Kijakazi</u>, No. 3:20-CV-01783, 2022 WL 526094, at *9–12 (M.D. Pa. Feb. 22, 2022); <u>Twila D.B. v. Kijakazi</u>, No. 2:20-cv-06304-AFM, 2022 WL 425936, at *2–3 (C.D. Cal. Feb. 10, 2022); <u>Pepper v. Kijakazi</u>, No. 6:20-cv-4159, 2022 WL 391577, at *2–3 (D.S.C. Feb. 9, 2022); <u>Rhonda W. v. Comm'r of Soc. Sec.</u>, No. 2:20-cv-5931, 2022 WL 390802, at *6–8 (S.D. Ohio Feb. 9, 2022); <u>Vickery v. Comm'r of Soc. Sec.</u>, No. 5:21-cv-122-PRL, 2022 WL 252464, at *2–5 (M.D. Fla. Jan. 27, 2022); <u>Carla D. v. Kijakazi</u>, No. 2:20-cv-00361-LRS, 2022 WL 264460, at *1–3 (E.D. Wash. Jan. 27, 2022); <u>Ramos v. Comm'r of Soc. Sec.</u>, No 1:20-cv-01606-EPG, 2022 WL 105108, at *2–4 (E.D. Cal. Jan. 11, 2022); <u>Nudelman v. Comm'r of Soc. Sec.</u>, No. CV-20-08301-PCT-MTL, 2022 WL 101213, at *10–13 (D. Ariz. Jan 11, 2022); <u>Mor v. Kijakazi</u>, No. 21-1730, 2022 WL 73510, at *3–5 (D.N.J. Jan. 7, 2022); <u>Hutchens v. Kijakazi</u>, No. 1:20CV1124, 2021 WL 5834409, at *6–14 (M.D.N.C. Dec. 9, 2021), <u>R. & R. adopted by</u> 2022 WL 1441227 (M.D.N.C. Jan. 5, 2022); <u>Olimpiada v. Kijakazi</u>, No. 2:21-cv-00196-CLB, 2022 WL 19678, at *4–5 (D. Nev. Jan. 3, 2022); <u>Benavidez v. Kijakazi</u>, No. 20-990, 2021 WL 6062715, at *4 (D.N.M. Dec. 22, 2021); <u>Wybo v. Kijakazi</u>, No. 20-518, 2021 WL 6052423, at *3–4 (E.D. Ky. Dec. 21, 2021); <u>Nathanial H. v. Kijakazi</u>, No. 6:19-cv-01280-AA, 2021 WL 5921377, at *4–6 (D. Or. Dec. 15, 2021); <u>Clark v. Kijakazi</u>, No. 20-cv-1363, 2021 WL 5905942, at *3–4 (E.D. Wis. Dec. 14, 2021); <u>Alice T. v. Kijakazi</u>, No. 8:21CV14, 2021 WL 5302141, at *18–19 (D. Neb. Nov. 15, 2021); and <u>Robinson v. Kijakazi</u>, No. 1:20-cv-00358, 2021 WL 4998397, at *2–3 (W.D.N.C. Oct. 27, 2021).

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 13), DENY Plaintiff's Motion for Summary Judgment, (ECF No. 11), and AFFIRM the Commissioner's finding of no disability.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

33

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 13, 2022